**McLEAN CONTRACTING COMPANY, Plaintiff,**

v.

**WATERMAN STEAMSHIP CORPORATION,**
Defendant.

No. Civ.A. 2:00CV525.

United States District Court,
E.D. Virginia,
Norfolk Division.

March 1, 2001.

Carter T. Gunn, Edward James Powers, Vandeventer, Black, LLP, Norfolk, VA, for Plaintiff.

John E. Holloway, Julia E. Keller, Hunton & Williams, Norfolk, VA, for Defendant.

### OPINION & ORDER

DOUMAR, District Judge.

This matter is before the Court on Defendant Waterman Steamship Corporation's ("Waterman") Motion for Summary Judgment. For the reasons that follow, Defendant's motion is **DENIED.**

### I. Factual and Procedural Background

In 1998, Plaintiff McLean Contracting Company ("McLean"), acting pursuant to a contract with the State of North Carolina, replaced the Newport River Railroad Bridge in Morehead City, North Carolina. Specifically, McLean replaced the old wooden trestle and track support with a new structure consisting of concrete piles, a pre-cast concrete cap, and a pre-stressed concrete superstructure unit to support the new track. The old wooden trestle was replaced in sections. Unfortunately for McLean, a portion of this work took place during the height of the Atlantic hurricane season, and, from August 26 through August 28, Hurricane Bonnie struck the coast of North Carolina, including the Port of Morehead City. On August 27, at the height of the hurricane, a barge owned by Waterman broke free from its moorings in the Port of Morehead City and allided with McLean's work-in-progress on the trestle. In the instant lawsuit, McLean alleges that Waterman was negligent in its control and care of the barge, causing the barge to break free from its moorings and damage the work-in-progress on the trestle.

As a result of the allision, McLean expended $17,562.33 in labor, materials, and equipment to repair damage to newly installed concrete T-beams on the trestle. At the time of the allision, McLean's work on the Newport River Railroad Bridge project was not completed, accepted, or paid for by the State of North Carolina. In addition, although it is undisputed that McLean did not own the trestle, McLean's contract with the State included a provision entitled "Contractor's Responsibility for Work," § 107–18, which stated that McLean shall have "charge and care" of the project and shall "rebuild, repair, restore, and make good all injuries or damages to any portion of the work" before final acceptance by the State, unless such damage was caused by an Act of God, in which case the State agreed to subsequently reimburse McLean for the cost of said repairs. *See* Rich Aff. ¶ 5, Pl.'s Ex. B.[1]

On July 18, 2000, McLean filed the instant suit against Waterman to recover its repair costs of $17,562.33. McLean alleges that Waterman was negligent under the circumstances, thereby causing the allision. Waterman answered raising various defenses, including Act of God. On January 31, 2001, Waterman filed the instant motion, seeking to dismiss this case on the grounds that McLean has no ownership

1. Section 107–18 of the contract between McLean and the State provides in full:

> 107–18 Contractor's Responsibility for Work
>
>   Until final acceptance of the work by the Engineer, as evidenced in writing, the Contractor shall have the charge and care thereof and shall take every precaution against injury or damage to any part thereof by the action of the elements, or from any other cause whether arising from the execution or from the nonexecution of the work. The Contractor shall rebuild, repair, restore, and make good all injuries or damages to any portion of the work occasioned by any of the above causes before final acceptance and shall bear the expense thereof, except as provided in other sections of the specifications. The Department will reimburse the Contractor for the repair of the work due to actions of the elements of such exceptional nature as to be legally classified as Acts of God.
>
>   In case of suspension of work from any cause whatever, the Contractor shall be responsible for all materials, and shall properly store them, if necessary, and shall provide suitable drainage of the roadway and erect temporary structures at no cost to the Department.

Rich Aff. ¶ 5, Pl.'s Ex. B.

interest in the Newport River Railroad Bridge and thus does not have standing to sue for the costs of repairs necessitated by the allision of Waterman's barge with McLean's work-in-progress regardless of any alleged negligence on the part of Waterman. McLean answered Waterman's motion on February 12, 2001, and Waterman filed its rebuttal memorandum on February 15, 2001. Accordingly, the issues raised by Waterman's Motion for Summary Judgment have been fully briefed and the matter is now ripe for disposition.

## II. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted where "the pleadings, depositions [and] answers to interrogatories ... show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The *Celotex* Court explained that, "[i]n such situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must demonstrate that there are specific facts that would create a genuine issue for trial. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *United States v. Lee,* 943 F.2d 366, 368 (4th Cir.1991).

## III. *Analysis*

In the case at bar, the material facts necessary to adjudicate the instant motion are not in dispute. Rather, the instant motion presents the legal issue of whether, in admiralty, a contractor has standing to bring suit against an alleged tortfeasor for damages caused to a trestle that is not owned by the contractor but is in the contractor's charge and care and over which the contractor has a duty to make repairs for any damage.[2] Waterman, citing the U.S. Supreme Court's decision in *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), asserts that under general maritime law a party cannot recover damages in tort for purely economic losses sustained as a result of damage to property owned by another person. McLean, in response, argues that the rationale of *Robins Dry Dock* does not apply to the case at bar due to the fact that McLean had a sufficient proprietary interest in its work-in-progress so as to have standing to sue Waterman for its repair. Since the resolution of this issue turns on the scope of the Supreme Court's decision in *Robins Dry Dock,* the Court's analysis necessarily begins with a discussion of that case.

### A. *The Robins Dry Dock Decision*

In *Robins Dry Dock,* the Supreme Court held that where a vessel was placed in dry dock for repairs, and the repairs were delayed due to the negligence of the shipyard, the vessel's time charterer did not have a cause of action against the shipyard for profits that would have been earned but for the shipyard's negligence and delay. *See id.* at 308, 309, 48 S.Ct.

---

**2.** Pursuant to the contract between McLean and the State of North Carolina, McLean had a duty to make *all* repairs regardless of what caused them, but was entitled to reimbursement from the State—the owner of the trestle—for any damages caused by an Act of God.

134. The *Robins Dry Dock* Court attempted to restrict the recovery of damages in admiralty so that potential claims are not limitless. Importantly, the claimant in *Robins Dry Dock* was a time charterer and *not* a demise charterer, and the owners of the vessel remained in possession of the vessel at the time of the shipyard's negligence and delay. *See id.* at 308, 48 S.Ct. 134. Since the claimant could not establish a property right in the vessel, the only basis for asserting liability against the shipyard was on the contract between the vessel's owner and the time charterer. On this point, the *Robins Dry Dock* Court held that "a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong." *Id.* at 309, 48 S.Ct. 134. Accordingly, the lost profits of a time charterer for damage incurred to the vessel were not recoverable. *See id.*

Concepts of foreseeability and remoteness are often cited as the underlying rationales for the *Robins Dry Dock* decision in the numerous maritime tort cases decided thereafter. For example, in *Matter of Complaint of Marine Navigation Sulphur Carriers, Inc.*, 507 F.Supp. 205 (E.D.Va. 1980), *aff'd*, 638 F.2d 700 (4th Cir.1981), which Waterman cites as controlling the instant matter before the Court, a bridge across the James River near Hopewell, Virginia was closed after being hit by a vessel. Various business owners in the Hopewell area who relied on the bridge sued the vessel, asserting "indirect harm in the nature of interference of contractual obligations, the loss of business expectancies, or the added cost of doing business." 507 F.Supp. at 209. None of the claimants "allege[d] any physical damage to their property or persons." *Id.* at 209. The Court stated that "[w]ith few exceptions the courts have generally held that a person who suffers only an indirect economic loss based on business expectations may not recover damages against a tortfeasor who prevents passage on a shipping lane

or on a land road." *Id.* Since none of the claimants alleged any physical loss or damage to their persons or property, and due to the remoteness of the injuries alleged by the claimants, the Court dismissed the claims. *See id.*

Although the general principles espoused in *Robins Dry Dock* and *Marine Navigation* with respect to remote and unforeseeable damages still stand on firm footing, the Fourth Circuit has not always applied the rule of *Robins Dry Dock* in a mechanical fashion, but rather has carved out exceptions where appropriate. For example, in *Venore Transportation Co. v. M/V Struma*, 583 F.2d 708 (4th Cir.1978), a demise charterer sued another vessel for loss of use to the demise charterer's vessel after a collision between the two vessels, and the tortfeasor attempted to raise the rule of *Robins Dry Dock* in defense of the demise charterer's claim. The Fourth Circuit held that *Robins Dry Dock* was distinguishable since the claimant in *Robins Dry Dock* was a time charterer, not a demise charterer, and the demise charterer in *Venore* had continued to make all of its charter payments to the vessel's owner after the collision. *See id.* at 708–09. Accordingly, the Fourth Circuit held that either the vessel owner or the demise charterer, but not both, could claim damages against the tortfeasor for loss of use but not lost profits. *See id.* at 711.

## B. *Application of Robins Dry Dock and Its Progeny to the Instant Case*

■ Waterman argues that the instant case is analogous to *Robins Dry Dock* and *Marine Navigation* in that McLean "alleges that, as a result of indirect, economic damages suffered when a Waterman barge allided with the Newport River Railroad Bridge, it is entitled to recover damages." Def.'s Br. at 5. According to Waterman, McLean "voluntarily assumed the costs of repair" for the damage inflicted by the barge instead of seeking reimbursement from the State under the "Act of God"

provision in the contract. Therefore, Waterman views McLean's status as either that of a "volunteer" without standing to sue for damage to the State's bridge, or as a claimant injured solely because it was under contract with the State to make repairs, unknown to the tortfeasor, and, under the rule of *Robins Dry Dock,* McLean is without standing to sue.

As McLean persuasively points out, however, and as more fully explained below, Waterman's characterizations of McLean's status misses the true nature of the relationship between the State and McLean with respect to McLean's work-in-progress. Consequently, the Court finds that the instant case is not analogous to *Robins Dry Dock* or *Marine Navigation* because, unlike the time charterer in *Robins Dry Dock* or the business owners in *Marine Navigation,* McLean had an actual proprietary interest in the damaged property sufficient to provide it with standing to sue Waterman.

▮ It is undisputed that McLean had "charge and care" of the entire trestle, including its work-in-progress, and was required to make all necessary repairs to the project. Pursuant to § 107–18 of the contract between McLean and the State of North Carolina, until the State gave its final acceptance of the project, McLean was obligated to repair all damage, with the State agreeing to subsequently reimburse McLean for the cost of any damage caused by an Act of God. As such, McLean had both possession and control of the trestle, including its work-in-progress. Actual title, or ownership of record, is not required to have standing to sue as long as McLean has an actual proprietary interest. *See Texas Eastern Trans. Corp. v. McMoRan Offshore Exploration Co.,* 877 F.2d 1214, 1224–25 (5th Cir.1989) (citing *Louisville & Nashville R.R. Co. v. Tug M/V Bayou Lacombe,* 597 F.2d 469, 474 (5th Cir.1979)). A proprietary interest may exist by demonstrating "actual possession or control, responsibility for repair, and re-

sponsibility for maintenance." *Id.* at 1225. All of these factors are present in the instant case and militate in favor of McLean. Again, under McLean's contract with the state, McLean had "charge and care" over the project until the State gave its final acceptance for McLean's work on January 12, 2000. The contract gave responsibility for maintenance and repair to McLean. Accordingly, McLean had a sufficient proprietary interest in the project to recover damages. The instant case, therefore, is more analogous to the Fourth Circuit's decision in Venore than the Supreme Court's decision in *Robins Dry Dock* since, like the demise charterer that the Fourth Circuit gave standing to sue in *Venore,* McLean had "charge and care" of the entire project, McLean's work-in-progress was not paid for nor accepted by the State, and McLean had an absolute obligation to repair any damage to the project prior to acceptance by the State.[3]

The Court also finds support for its decision that McLean had a proprietary interest in the trestle sufficient to provide standing to sue since McLean unquestionably held an insurable interest in its work-in-progress. *See, e.g., E.C. Long, Inc. v. Brennan's of Atlanta, Inc.,* 148 Ga.App. 796, 252 S.E.2d 642 (1979) (holding that a contractor erecting a structure has an insurable interest therein); *American & Foreign Ins. Co. v. Allied Plumbing & Heating Co.,* 36 Mich.App. 561, 194 N.W.2d 158 (1971) (same); *Appleman's Insurance Law* § 2142 (1973 & Cum.Supp. 2000). An insurable interest is defined as "a real and substantial interest in specific property as will prevent a contract to indemnify the person interested against its loss from being a mere wager policy," or "such an interest as will make the loss of the property of pecuniary damage to the insured." *Black's Law Dictionary* 720 (5th Ed.1979). It follows, therefore, that where McLean has an insurable interest in its work-in-progress, it also has a proprie-

3. *See supra* note 2.

tary interest sufficient to give it standing to sue Waterman under the facts of the instant case.

Finally, allowing McLean to recover if it is able to prove negligence on the part of Waterman will not open the floodgates to a limitless succession of plaintiffs. Waterman, if fault is shown, will simply be required to pay for the physical damage to the T-beams caused by its barge. Certainly, it is reasonably foreseeable for Waterman, if fault is shown, to pay repair costs of damage inflicted by its barge. Moreover, McLean's claim is not one for "indirect harm in the nature of interference of contractual obligations, the loss of business expectations, or the added cost of doing business" such as the claims at issue in *Marine Navigation*. *Marine Navigation*, 507 F.Supp. at 209. Rather, McLean seeks to recover its actual costs of labor, materials, and equipment to repair allision damage caused by Waterman's barge, and, if they are able to prove negligence on the part of Waterman, such damages rightfully belong to McLean. Accordingly, Waterman's Motion for Summary Judgment is **DENIED.**

### IV. *Conclusion*

For the reasons stated herein, Waterman's Motion for Summary Judgment is **DENIED.** The Clerk is **DIRECTED** to mail a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**